## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

DANIEL J. CAMPBELL,

               Petitioner,

    vs.

SCOTT R. FRAKES,

               Respondent.

**8:20CV92**

**MEMORANDUM AND ORDER**

    This matter is before the court on Daniel J. Campbell's ("Petitioner" or "Campbell") Petition for Writ of Habeas Corpus. (Filing 1.) For the reasons that follow, Petitioner's habeas petition is denied and dismissed with prejudice.

## I.  CLAIMS

    Summarized and condensed,[1]  and as set forth in the court's initial review order (filing 3), Campbell asserted the following claims that were potentially cognizable in this court:

Claim One:      Petitioner received ineffective assistance of counsel because counsel (1) failed to argue Petitioner's motions for new trial or withdraw and allow Petitioner to argue the motions himself; (2) continued to represent Petitioner through the appeal despite obvious dissatisfaction with his performance; (3) failed to properly investigate and challenge the production of the weapon found months after the incident; (4) failed to challenge and properly

---

[1]  Petitioner did not object to the court's summary and condensation.

cross-examine and impeach the State's witness, Marissa McCormack; (5) failed to seek independent testing of the firearm alleged to have been used in the incident; (6) failed to depose one of the State's witnesses, Christian Sipherd, and present to him a lineup to show that no identification of Petitioner could be made; (7) failed to challenge and seek evaluation of McCormack's competency; (8) failed to object to testimony regarding Petitioner's possession of the same or a similar shotgun days before the incident; (9) failed to challenge discussion between two witnesses in close proximity to one of the jurors as violating the sequestration order and denying Petitioner a fair trial; (10) failed to challenge certain jury instructions as incomplete; (11) failed to seek an independent evaluation of DNA evidence to show it as inconclusive; (12) failed to have the gunshot residue testing that was done processed; and (13) failed to sequester the jury in light of the recent shooting of an Omaha police officer.

Claim Two:        Petitioner was denied his right to a fair trial because of jury misconduct where two of the State's witnesses discussed the case in detail outside of the courtroom while a jury member listened in and admitted to asking a question.

Claim Three:      Petitioner was denied his right to a fair trial because the jury instruction on the charge of discharging a firearm while in or in proximity of any motor vehicle at any person or occupied motor vehicle improperly excluded the term "recklessly."

2

## II.  BACKGROUND

### A.  Convictions and Sentences

The court states the facts as they were recited by the Nebraska Court of Appeals on direct appeal in *State v. Campbell*, No. A-16-176, 2016 WL 6872979 (Neb. Ct. App. Nov. 22, 2016) ([filing 7-3](#)). *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

On September 21, 2015, an amended information was filed charging Campbell with two counts of Attempted Assault on an Officer in the First Degree, one count of Discharging a Firearm While In or In Proximity of any Motor Vehicle at any Person or Occupied Motor Vehicle, three counts of Use of a Deadly Weapon to Commit a Felony, and one count of Possession of a Deadly Weapon by a Prohibited Person.

A jury trial took place from November 2 to November 5, 2015. Nebraska State Patrol Trooper Steven Peck testified that he was working the night of February 4, 2015, with his partner Trooper Andrew Phillips. They were assigned to a section of Interstate 80. Peck described the weather conditions at the time as extremely cold with snow on the roads. Peck stated that Phillips was driving the patrol cruiser and made a decision to pull a vehicle over for a rear light violation. Peck testified that they activated the overhead lights on the cruiser and that he observed the vehicle going back and forth from the shoulder of the road several times. He also testified that the vehicle signaled a right lane change indicating it was going to pull over onto the shoulder of the road but did not do so.

Peck testified that while he and Phillips were pursuing the vehicle, he observed the front seat passenger look back at the troopers and determined that the passenger appeared to be a white male with short hair wearing a dark-colored jacket. The vehicle exited the Interstate onto Center Street eastbound and continued to the

intersection of 108th Street where the vehicle turned south. Peck testified that as he was reaching for the microphone in the cruiser to call in a pursuit, he heard a loud sound and looked up to see the passenger of the vehicle hanging out of the passenger side of the vehicle with a shotgun. The passenger fired a second shot, hitting the windshield of the cruiser and leaving a hole right in front of where Peck was sitting. After the two shots were fired, Phillips stopped the cruiser, at which time the troopers confirmed neither of them were injured and they relayed information to other officers. The troopers lost view of the suspect vehicle at that time. Peck testified that he was unable to get a specific facial description of the shooting suspect from either his direct observation or his review of the cruiser video.

Peck testified that he and Phillips began following the vehicle about 12:05 a.m. and followed the vehicle for three to five minutes before the shots were fired. He testified the call to other officers that shots had been fired was logged at 12:09 a.m. The type of shooting reported was a sawed-off shotgun.

Phillips confirmed that he was working alongside Peck on February 4 and into February 5, 2015, when they attempted to pull over a vehicle for a broken taillight. Phillips testified that during the pursuit of the vehicle, he turned on a spotlight to illuminate the vehicle. He could see a front passenger in the vehicle who appeared to be male and was looking back at the officers.

Phillips testified that suddenly he noticed the passenger reach out the window and fire shots at them. He observed the passenger to be either a white male or a light-skinned Hispanic male with short dark hair, as well as a dark jacket. He also saw that the gun was a sawed-off shotgun. Phillips heard two shots, and the second shot hit the windshield of the cruiser. After Phillips stopped the cruiser, he observed two holes in the windshield, a dent on the hood, and a broken spotlight.

Nebraska State Patrol Trooper Todd Steckelberg testified that he received a dispatch call shortly after midnight on February 5, 2015, indicating that shots had been fired at two officers. Steckelberg directed law enforcement agencies in the area

to set up a perimeter in the area of the shooting. Steckelberg testified that he became aware of a subsequent call from Trooper Trinity Jones, who requested assistance in making a traffic stop on a vehicle matching the suspect vehicle, and he responded. Jones testified that the initial dispatch call regarding the shooting came out at 12:05 a.m. and that he observed the suspect vehicle at 12:09 a.m.

When Steckelberg arrived on scene, Jones informed him that only one individual was observed in the vehicle. They took the female driver, Marissa McCormack, into custody and then confirmed there were no other occupants in the vehicle. Steckelberg testified that he established the location of the perimeter based on McCormack's statement that she dropped off a male passenger on a side street and on his review of the video recording of the shooting from the cruiser's camera.

Steckelberg testified that around 1:40 a.m., Campbell was found hiding in a vehicle parked on a street. No weapon was recovered at that time.

Christian Sipherd testified that on the night of February 4, 2015, he was removing snow from the parking lot of a shopping area near 108th and Center in Omaha. He could see police cars with their lights flashing across the street from where he was, blocking the off ramp from the Interstate onto Center Street and on 108th Street and Center. He testified that he observed someone running through the parking lot heading north. The individual then disappeared from his sight. A few minutes later, he saw the same individual approaching his vehicle, waving a cell phone, trying to get Sipherd's attention. Sipherd testified that the situation "didn't feel right" so he left the area. He testified that the individual headed towards the south, into a residential neighborhood. Sipherd estimated that less than five minutes elapsed between the first and second time he saw the individual. Sipherd described the individual as a Latino male, wearing a black "hoody" or jacket. Sipherd was unable to identify Campbell at trial as the individual he observed that evening.

State Patrol Trooper Jason Prante testified that an individual who lived in the area where the officers were searching advised officers of footprints in the snow in

his yard that did not exist when he went to bed. Prante and Trooper John Mobley began searching in the neighborhood where the footprints were found, and they observed the same footprints in several different areas. Prante described the footprints as being made by a sneaker with a zig-zag or lightning strike pattern horizontal across the bottom of the shoe. Prante testified that there was no other foot traffic from civilians in the area being searched. The only other footprints were made by the boots of officers doing the search.

After following the footprints in the neighborhood, the prints ended at the street in front of a residence. Mobley suggested that they search the vehicles parked on the street. Upon doing so, Prante and Mobley discovered Campbell lying down in the backseat of a car.

After placing Campbell into custody, Prante and Mobley searched the vehicle where Campbell had been hiding. There were no weapons found during the search. Prante testified that Campbell's shoes appeared to have the same print as the footprints he had been following. Prante also observed Campbell was wearing a dark-colored jacket. Mobley testified that Campbell matched the description of the subject being sought—a light-skinned Hispanic male with a dark coat—and his shoes appeared to match the footprints he had been following.

Stephen Vaccaro, who works for the Omaha Police Department Crime Lab, testified that he investigated the scene where the shooting took place and found two spent shotgun shells and a component to one of the shot shells. He also investigated the car where Campbell was found hiding, where he located a cellphone and a small baggie of marijuana in the back of the car. The owner of the car testified that the cellphone and marijuana did not belong to him.

Vaccaro also investigated McCormack's vehicle, where he found a lawn chair bag on the floor of the front passenger side and a backpack on the back seat. The backpack contained numerous items, including the buttstock of a firearm, shotgun shells, and an ammunition belt. The backpack also contained personal items, such as

an electric hair trimming kit, toothbrush, deodorant, dental floss, razors, and combs. A forensic scientist who works for the State Patrol testified that Campbell's DNA was found on the toothbrush and electric hair trimmer.

Vaccaro also testified that after searching the interior and exterior of McCormack's vehicle, only two latent fingerprints were identifiable and lifted from the vehicle. Neither of the fingerprints were Campbell's.

Charles Graeve, who lived in the neighborhood that was searched by officers in the early morning hours on February 5, 2015, testified that on April 4, 2015, he found a shotgun in his yard waste can. He explained that he had not done any yard work between February 5 and April 4, and on April 4 he picked up his yard waste can, which was located by the side of his house, so that he could do some yardwork, and he discovered the gun inside. After finding the shotgun, he called 911 and officers came to collect the evidence.

McCormack testified that she had only known Campbell for a couple weeks before the shooting incident. She and Campbell had smoked methamphetamine a couple of times together, including February 4, 2015. McCormack testified that prior to the shooting, she was using methamphetamine on a daily basis and using multiple times each day. McCormack testified that when she was using methamphetamine, she would not take her prescribed psychiatric medication, which caused her to be unstable.

Since February 5, 2015, McCormack has taken steps to change her life around. She testified that her medications are stable, she sees a psychiatrist, goes to therapy, and is in chemical dependency group therapy and a mental health day program.

McCormack testified that she saw Campbell with a shotgun the day before the shooting and saw him point it at a man while they were at McCormack's friend's house. She stated that Campbell kept the shotgun in a long green bag and that he also carried around a blue backpack.

7

She testified that during the day on February 4, 2015, she drove Campbell around to different locations, and no one else was in the vehicle besides her and Campbell. At some point, they went to Campbell's friend's house. McCormack testified that Campbell had the long green bag and the backpack with him at that time. Campbell stayed at the friend's house into the evening, but McCormack left the house on two occasions. After McCormack returned the second time, Campbell asked her to take him someplace, but did not tell her where. The two of them left the friend's house, stopped at a gas station to fill up McCormack's vehicle, and then got on Interstate 80. There was video footage entered into evidence showing McCormack at the gas station with a male passenger in her car.

Shortly after getting on the Interstate, the officers turned on their overhead lights and wanted her to stop her vehicle. McCormack testified that she started to pull her vehicle over to the side of the road, but Campbell told her not to. She testified that she did not stop her vehicle because she was afraid, given that Campbell had a gun and he instructed her not to stop. At the time, Campbell was in the front passenger seat, and the lawn chair bag and backpack were between his legs.

McCormack testified that Campbell told her to exit the Interstate at Center Street, which she did, and then turned south onto 108th Street. At that point, Campbell opened the car door, sat on the door, and fired two shots at the officers with a shotgun. She believed the shotgun he used was the same weapon she observed Campbell with the day before.

McCormack testified that after Campbell fired the shots, he told her to make a right-hand turn into a residential neighborhood, which she did, and when they got part way down the street, Campbell jumped out of the car. The shotgun was not in the car after Campbell jumped out.

McCormack testified that she entered into a plea agreement with the State regarding charges against her as a codefendant in this case. McCormack stated that

8

the terms of her plea agreement required her to fully cooperate in the prosecution of Campbell and to testify truthfully against him.

Angela King testified that she was dating Campbell at the time of the events at issue and recalled having a telephone conversation with him on the night of February 4, 2015. She believed that Campbell was riding in a car during the conversation because it sounded windy. King stated that Campbell sounded normal, like everything was fine. During the conversation, Campbell told her to "hold on" and then the phone either "died" or lost the call. King testified that she did not hear gunshots during the call.

Sean Schmidt, an AT&T retail store manager, testified regarding phone records and confirmed that there appeared to be a phone call involving Campbell's phone from 11:59 p.m. on February 4, 2015 to 12:09 a.m. on February 5, 2015. King agreed that the first conversation between Campbell and herself took place between 11:59 a.m. on February 4, 2015 and 12:09 a.m. on February 5, 2015, as the telephone records indicated.

King testified that Campbell called her later that night, asking her to pick him up in West Omaha. She tried to call him back multiple times, but the calls went to voicemail.

McCormack testified that she did not know if Campbell used his cellphone during the time frame in question. She stated that it was possible Campbell used his cellphone, but if he did, she did not see him using it.

Amy Weber, a forensic scientist with the State Patrol, testified that she examined several pieces of evidence in the case, including the shotgun, the two fired shot shells recovered from the scene, and the buttstock found in the backpack. She testified that based on her testing, the shot shells recovered from the scene were fired by the shotgun that was submitted for testing. She also testified that the buttstock was compatible for use with the shotgun.

9

After the State rested, Campbell made a motion to dismiss, which the trial court overruled. Campbell did not present evidence, and the case was submitted to the jury. The jury found Campbell guilty on all counts.

The trial court sentenced Campbell to 25 to 25 years' imprisonment on each of the two counts of Attempted Assault on an Officer in the First Degree; 10 to 10 years' imprisonment on the count of Discharging a Firearm While In or In Proximity of any Motor Vehicle at any Person or Occupied Motor Vehicle; 10 to 10 years' imprisonment on each of the three counts of Use of a Deadly Weapon to Commit a Felony; and 10 to 10 years' imprisonment on the count of Possession of Deadly Weapon by a Prohibited Person. The court ordered all sentences to run consecutively.

## B.  Direct Appeal

Campbell appealed his convictions and sentences to the Nebraska Court of Appeals. (Filing 7-1.) Campbell was represented both at trial and on direct appeal by the same attorney. In his direct appeal, Campbell assigned and argued that the trial court erred in (1) failing to find the evidence was insufficient to find him guilty of the charges in the amended information and (2) imposing excessive sentences. (Filing 7-5; *see also* Filing 7-3.) In a memorandum web opinion dated November 22, 2016, the Nebraska Court of Appeals affirmed Campbell's convictions and sentences, rejecting his claims on the merits. (Filing 7-3.) Campbell did not file a petition for further review with the Nebraska Supreme Court. (*See* Filing 7-1 at CM/ECF p. 4.)

## C.  Postconviction Action

On August 2, 2017, Campbell filed a timely pro se motion for postconviction relief. (Filing 7-11 at CM/ECF pp. 13-22.) Campbell set forth multiple claims of ineffective assistance of trial counsel. He claimed that counsel was ineffective for (1) failing to argue his motions for new trial or withdraw and allow him to argue the

motions himself; (2) continuing to represent him through the appeal despite obvious dissatisfaction with his performance; (3) failing to properly investigate and challenge the production of the weapon found months after the incident; (4) failing to challenge and properly cross-examine and impeach the State's witness, Marissa McCormack; (5) failing to seek independent testing of the firearm alleged to have been used in the incident; (6) failing to depose one of the State's witnesses, Christian Sipherd, and present to him a lineup to show that no identification of Campbell could be made; (7) failing to challenge and seek evaluation of McCormack's competency; (8) failing to object to testimony regarding Campbell's possession of the same or a similar shotgun days before the incident; (9) failing to challenge discussions between two witnesses in close proximity to one of the jurors as violating the sequestration order and denying Campbell a fair trial; (10) failing to challenge certain jury instructions as incomplete; (11) failing to seek an independent evaluation of DNA evidence to show it as inconclusive; (12) failing to have the gunshot residue testing that was done processed; and (13) failing to sequester the jury in light of a recent shooting of an Omaha police officer. (Filing 7-11 at CM/ECF pp. 14-17.)

Campbell further alleged that certain communications between two of the State's witnesses made within close proximity of one of the jurors outside of the courtroom amounted to juror misconduct and that the trial court's failure to declare a mistrial or remove the juror from the case denied him a fair trial. (Filing 7-11 at CM/ECF pp. 17-19.)

Finally, Campbell alleged that the jury was improperly instructed on the charge of Discharging a Firearm While In or In Proximity of any Motor Vehicle at any Person or Occupied Motor Vehicle. (Filing 7-11 at CM/ECF pp. 19-20.) Campbell argued that the instruction given to the jury improperly excluded the term "recklessly" and that such omission removed an essential issue or element of the case. (Filing 7-11 at CM/ECF pp. 19-20.) Campbell correctly noted in his postconviction motion that no objection was made to any of the jury instructions at trial. (Filing 7-11 at CM/ECF p. 19.)

On July 9, 2018, the state district court denied Campbell's motion for postconviction relief without an evidentiary hearing. (Filing 7-11 at CM/ECF pp. 23-27.) It concluded that Campbell's claims of ineffective assistance of counsel were "generic" and failed to allege prejudice:

> [T]he facts alleged by [Campbell] relating to failure to investigate are generic, do not state what exculpatory evidence would have been gathered, or how a different result would have been obtained. Such facts are insufficient to warrant an evidentiary hearing. See *State v. Biloff*, 18 Neb. App. 215, 778 N.W.2d 497 (2009) (finding it insufficient to state counsel was ineffective in failing to properly investigate when defendant failed to include "allegations about what his attorney would have uncovered had his attorney interviewed witnesses or examined the evidence").

(Filing 7-11 at CM/ECF p. 26.)

As to both of Campbell's claims of juror misconduct and improper jury instructions, the state district court held that such claims were issues that could have been brought on direct appeal and were therefore procedurally barred. (Filing 7-11 at CM/ECF p. 26.)

Campbell appealed to the Nebraska Court of Appeals, assigning that the state district court erred in (1) denying him an evidentiary hearing on his motion for postconviction relief based on allegations of ineffective assistance of counsel for failure to investigate and challenge the State's witnesses and evidence, (2) finding that his postconviction claim of juror misconduct was procedurally barred by failure to raise it on direct appeal, and (3) finding that his postconviction claim of improper jury instructions was procedurally barred by failure to raise it on direct appeal. (Filing 7-7 at CM/ECF pp. 5-6.) With respect to the jury misconduct and jury instruction issues, Campbell argued that the state district court incorrectly construed his claims as direct challenges to the juror misconduct and jury instructions, rather than claims of ineffective assistance of counsel for failure to preserve the issues and

raise them on direct appeal. (Filing 7-7 at CM/ECF pp. 37-42; *see also* Filing 7-4 at CM/ECF p. 9, 10.)

In a memorandum web opinion dated November 5, 2019, the Nebraska Court of Appeals affirmed the state district court's order denying Campbell's motion for postconviction relief without an evidentiary hearing. (Filing 7-4.) The court addressed and rejected the thirteen ineffective assistance of counsel claims that were raised in Campbell's postconviction motion. (Filing 7-4 at CM/ECF pp.  4-9.) In addressing these ineffective assistance of counsel claims, the Nebraska Court of Appeals correctly stated the deficient performance and prejudice prongs of the *Strickland v. Washington*, 466 U.S. 668 (1984), standard as the applicable legal standard. (Filing 7-4 at CM/ECF p. 4.) With respect to the juror misconduct issue, the court concluded that, even assuming Campbell asserted ineffective assistance of counsel for failure to preserve the issue and raise it on direct appeal, Campbell failed to establish prejudice because the record "indicate[d] that the juror was not influenced by any outside discussion of the case by the State's witnesses." (Filing 7-4 at CM/ECF pp. 9-10.) With respect to the jury instruction issue, the court determined that Campbell's direct challenge to the jury instructions was procedurally barred because Campbell did not object to the instructions at trial or raise the propriety of the jury instructions on direct appeal. (Filing 7-4 at CM/ECF pp. 10-11.) The court further concluded that even if Campbell's jury instruction claim was appropriately raised as an ineffective assistance of counsel claim, the claim was without merit. (Filing 7-4 at CM/ECF pp. 11-12.)

Campbell filed a petition for further review with the Nebraska Supreme Court. (Filing 7-9.) Campbell assigned that the Nebraska Court of Appeals erred in affirming the state district court's denial of an evidentiary hearing on his motion for postconviction relief because of (1) ineffective assistance of trial counsel and (2) ineffective assistance of appellate counsel for failing to properly preserve juror misconduct issues. (Filing 7-9 at CM/ECF p. 1.) With respect to the ineffective assistance of trial counsel claims, Campbell sought review of only four of the thirteen ineffective assistance of counsel claims rejected by the Nebraska Court of

Appeals: (1) failure to properly investigate and challenge the production of the weapon months after the incident; (2) failure to have independent testing of the firearm involved in the incident; (3) failure to ask for independent evaluation of the DNA on the toothbrush found in McCormack's car to show it inconclusive; and (4) failure to have the gun shot residue testing done on the night of the incident processed to prove the innocence of Campbell. (Filing 7-9 at CM/ECF pp. 5-8.)

On January 3, 2020, the Nebraska Supreme Court denied Campbell's petition for further review. (Filing 7-2 at CM/ECF p. 5.) The mandate was issued on January 17, 2020. (Filing 7-2 at CM/ECF p. 5.)

**D. Habeas Petition**

Campbell filed his Petition for Writ of Habeas Corpus in this court on March 9, 2020. (Filing 1.) In response to the Petition, Respondent filed an Answer (filing 9), a Brief (filing 10), and the relevant state court records (filing 7). Campbell did not file a brief in response to Respondent's Answer and Brief.[2] Respondent filed a Notice of Submission indicating that he would not be filing a reply brief as Campbell did not file a response brief. (Filing 11.) This matter is fully submitted for disposition.

## III. OVERVIEW OF APPLICABLE LAW

Three strands of federal habeas law intertwine in this case. They are (1) exhaustion and procedural default; (2) the deference that is owed to the state courts when a federal court reviews the factual or legal conclusions set forth in an opinion of a state court; and (3) the standard for evaluating a claim of ineffective assistance of counsel. The court elaborates upon those concepts next so that it may apply them later in a summary fashion as it reviews Campbell's claims.

---

[2] Petitioner submitted a letter (filing 8) prior to Respondent filing his answer essentially asking the court to carefully consider his case.

## A. Exhaustion and Procedural Default

As set forth in 28 U.S.C. § 2254:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented to the trial court, and then in an appeal to either the Nebraska

Supreme Court directly[3] or to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation omitted). Although the language need not be identical, "[p]resenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or

---

[3] Where a life sentence has been imposed in a criminal case, the appeal goes directly to the Nebraska Supreme Court. Neb. Rev. Stat. § 24-1106.

demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Also, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). To invoke the actual innocence exception, a petitioner "must show that in light of all the evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Jennings v. United States*, 696 F.3d 759, 764-65 (8th Cir. 2012) (quoting *Schlup v. Delo*, 513 U.S. 298, 327, (1995)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

## B. Nebraska Law Relevant to Procedural Default

Under Nebraska law, you don't get two bites of the postconviction apple; that is, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003). Additionally, "[a] motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002). *See also State v. Thorpe*, 858 N.W.2d 880, 887 (Neb. 2015) ("A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased.").

Moreover, a person seeking postconviction relief must present his or her claim to the district court or the Nebraska appellate courts will not consider the claim on appeal. *State v. Deckard*, 722 N.W.2d 55, 63 (Neb. 2006) (denying postconviction relief in a murder case and stating: "An appellate court will not consider as an assignment of error a question not presented to the district court for disposition through a defendant's motion for postconviction relief.") Similarly, on appeal, the appealing party must both assign the specific error and specifically argue that error

in the brief. Otherwise the claim is defaulted under Nebraska law. *State v. Henry*, 875 N.W.2d 374, 407 (Neb. 2016) (stating an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court).

Note also that Nebraska has a statute of limitations for bringing postconviction actions that is similar to federal law. It reads:

> (4) A one-year period of limitation shall apply to the filing of a verified motion for postconviction relief. The one-year limitation period shall run from the later of:
>
> > (a) The date the judgment of conviction became final by the conclusion of a direct appeal or the expiration of the time for filing a direct appeal;
> >
> > (b) The date on which the factual predicate of the constitutional claim or claims alleged could have been discovered through the exercise of due diligence;
> >
> > (c) The date on which an impediment created by state action, in violation of the Constitution of the United States or the Constitution of Nebraska or any law of this state, is removed, if the prisoner was prevented from filing a verified motion by such state action;
> >
> > (d) The date on which a constitutional claim asserted was initially recognized by the Supreme Court of the United States or the Nebraska Supreme Court, if the newly recognized right has been made applicable retroactively to cases on postconviction collateral review; or
> >
> > (e) August 27, 2011.

Neb. Rev. Stat. § 29-3001(4).

## C.  Deferential Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Id.* at 405-06. Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA [Antiterrorism and Effective Death Penalty Act] standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id.* at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

## D.  The Especially Deferential *Strickland* Standard

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for offenders to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Further, as set forth in *Strickland*, counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

# IV. DISCUSSION

## A. Claim One, Subparts (1), (2), (4), (6), (7), (8), (9), (10), and (13)

Although Subparts (1), (2), (4), (6), (7), (8), (9), (10), and (13) of Claim One were raised in Campbell's postconviction motion and on postconviction appeal to the Nebraska Court of Appeals, the claims are procedurally defaulted because they were not raised in his petition for further review to the Nebraska Supreme Court. (*See* Filing 7-9 at CM/ECF pp. 5-8.) As a result, Campbell has not invoked one complete round of Nebraska's established appellate review process as it relates to these claims. The claims are now procedurally defaulted, not unexhausted, because the Nebraska courts would not entertain a successive postconviction motion based on these claims because they were raised in Campbell's postconviction motion and on postconviction appeal to the Nebraska Court of Appeals. Furthermore, any successive postconviction motion filed by Campbell would also be barred by Nebraska's statute of limitations. Thus, these claims have been procedurally defaulted.

Campbell has failed to show cause and prejudice to excuse the defaults.[4] Nor has he made any attempt to show that he was actually (factually) innocent.

---

[4] Even assuming *Martinez v. Ryan*, 566 U.S. 1 (2012), applies to federal habeas corpus cases arising from Nebraska convictions, *see Kidder v. Frakes*, 400 F. Supp. 3d 809, 818 n.4 (D. Neb. 2019), *Martinez*'s narrow exception to the procedural default doctrine does nothing to excuse the procedural default of these claims. The court does not believe that *Martinez* applies where ineffective assistance of trial counsel claims were litigated in an initial-review collateral proceeding, but either not preserved on appeal or not presented in a petition for further review if the Nebraska Court of Appeals rules against the petitioner. *See Arnold v. Dormire*, 675 F.3d 1082, 1086-88 (8th Cir. 2012) ("The Court made clear that the holding in *Martinez* did not 'concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings . . . .'") (citing and quoting *Martinez*, 566 U.S. at 16).

## B.  Claim One, Subparts (3), (5), and (11)

Campbell invoked one complete round of Nebraska's established appellate review process as it relates to these claims. The state district court concluded that Campbell's claims of ineffective assistance of counsel were "generic" and failed to allege prejudice. (Filing 7-11 at CM/ECF p. 26 (citing *State v. Biloff*, 778 N.W.2d 497 (Neb. Ct. App. 2009).) On appeal from the denial of the postconviction motion, the Nebraska Court of Appeals rejected the specific claims as follows:

### Claim One, Subpart (3)

Campbell argues that trial counsel was deficient for failing to investigate and challenge the production of the firearm that was discovered several months after the incident. Specifically, Campbell argues that trial counsel should have conducted depositions regarding the discovery of the weapon, particularly the homeowner who found it. However, Campbell fails to provide any indication of what new or conflicting evidence would have been revealed had those depositions occurred. Campbell merely states in his postconviction motion that challenging the State's physical evidence, the firearm, "would have changed the outcome [of] the trial drastically [sic]."

In *State v. Newman*, 300 Neb. 770, 916 N.W.2d 393 (2018), the defendant argued that his trial counsel was ineffective for failing to hire a crime scene investigator to rebut inconsistencies in the testimony of one of the State's witnesses. Similarly, Campbell argues that the weapon's "miraculous appearance" should have been investigated further and depositions taken to devalue the use of the gun as evidence. Brief for appellant at 29. "A petitioner's postconviction claims that his or her defense counsel was ineffective in failing to investigate possible defenses are too speculative to warrant relief if the petitioner fails to allege what exculpatory evidence the investigation would have procured and how it would have affected the outcome of the case." *State v. Newman*, 300 Neb. at 792, 916 N.W.2d at 412 (citing *State v. Edwards*, 284 Neb. 382, 821 N.W.2d 680 (2012)). Campbell has not provided any indication of what further depositions surrounding the weapon, or other additional investigation, would have revealed or how

it would have affected the outcome of the case. Campbell has not established prejudice and an evidentiary hearing was not warranted on this claim.

(Filing 7-4 at CM/ECF p. 5.)

### Claim One, Subpart (5)

Campbell asserts that trial counsel was deficient for failing to seek independent testing of the firearm after it was discovered several months after the incident. While counsel in his brief suggests that independent testing of the firearm could have revealed "the possibility of other fingerprints" or otherwise casted doubt on the fact that the firearm was the same one used to fire at the troopers, there is nothing in the record, nor in Campbell's postconviction motion, to support such arguments. Brief for appellant at 31. A petitioner's postconviction claims that his or her defense counsel was ineffective in failing to investigate possible defenses are too speculative to warrant relief if the petitioner fails to allege what exculpatory evidence the investigation would have procured and how it would have affected the outcome of the case. *State v. Newman*, 300 Neb. 770, 916 N.W.2d 393 (2018). Again, Campbell states that further investigation would have changed the outcome of the case, but fails to articulate how. Such conclusory statements are not sufficient to warrant an evidentiary hearing.

(Filing 7-4 at CM/ECF p. 6.)

### Claim One, Subpart (11)

Campbell next argues that trial counsel was deficient for failing to hire an independent expert to analyze and evaluate the DNA evidence found on a toothbrush in McCormack's vehicle. Standing alone, this allegation is insufficient to warrant an evidentiary hearing. We find persuasive the district court's comparison to *State v. Sellers*, 290 Neb. 18, 858 N.W.2d 577 (2015). In *Sellers*, the petitioner claimed his trial counsel was ineffective for failing to hire an independent investigator, consult a ballistics expert, review the crime scene, etc. The Nebraska

24

Supreme Court found that such allegations were insufficient to warrant an evidentiary hearing, as they did not establish prejudice.

> However, [the petitioner] failed to allege how undertaking the above activities would have produced a different outcome at trial. More specifically, he did not identify any exculpatory evidence that the activities would have procured. As the district court observed, his allegations consisted solely of conclusory statements, such as, "'[I]f trial and/or appellate counsel would have investigated and hired an investigator to fully investigate the case at bar, there surely would have been a different outcome in [his] trial.'"

> Such conclusory allegations are insufficient to establish the prejudice prong of the *Strickland* test. We have previously observed that a petitioner's postconviction claims that his or her trial counsel was ineffective in failing to investigate possible defenses are too speculative to warrant relief if the petitioner fails to allege what exculpatory evidence that the investigation would have procured and how it would have affected the outcome of the case. And in assessing postconviction claims that trial counsel was ineffective in failing to call a particular witness, we have upheld dismissal without an evidentiary hearing where the motion did not include specific allegations regarding the testimony which the witness would have given if called.

*Id.* at 27-29, 858 N.W.2d at 587.

Here, Campbell again fails to allege prejudice with any sort of particularity. While Campbell alleges that his trial counsel should have hired an expert to testify regarding match probabilities surrounding the DNA evidence acquired from items in McCormack's vehicle, he fails to identify a specific witness that should have been called, or what they would have testified to. Similar to *Sellers*, this allegation does not sufficiently allege what exculpatory evidence would have been elicited through expert testimony and how it would have affected the outcome of the trial, and was insufficient to warrant an evidentiary hearing.

25

(Filing 7-4 at CM/ECF pp. 8-9.)

In short, the Nebraska state courts carefully reviewed the pleadings and concluded that Campbell failed to sufficiently allege prejudice under the Nebraska pleading rules. *See State v. Dragon*, 843 N.W.2d 618, 623 (Neb. 2014) ("If a postconviction motion alleges only conclusions of fact or law, . . . the court is not required to grant an evidentiary hearing."); *see also State v. Newman*, 916 N.W.2d 393, 412 (Neb. 2018) ("A petitioner's postconviction claims that his or her defense counsel was ineffective in failing to investigate possible defenses are too speculative to warrant relief if the petitioner fails to allege what exculpatory evidence the investigation would have procured and how it would have affected the outcome of the case."). Therefore, these claims are procedurally defaulted pursuant to an independent and adequate state procedural rule. *See Hunt v. Houston*, 563 F.3d 695, 703 (8th Cir. 2009) ("Federal courts generally will not review claims that a state court has refused to consider because of the petitioner's failure to satisfy a state procedural requirement"); *Sing v. Frakes*, No. 8:15CV134, 2016 WL 3248244, at *5 (D. Neb. June 13, 2016) (same); *see also Ildefonso v. Gage*, No. 4:13CV3110, 2016 WL 1092468, at *9 (D. Neb. Mar. 21, 2016), *certificate of appealability denied* (Sept. 15, 2016) (the Nebraska Supreme Court's decision to refuse to consider claims that alleged only conclusions of fact or law was based on a firmly established state procedural rule; in Nebraska, if a postconviction motion alleges only conclusions of fact or law, then the court is not required to grant an evidentiary hearing). The Nebraska courts would not entertain a successive postconviction motion based on these same claims, and any successive postconviction motion filed by Campbell would also be barred by Nebraska's statute of limitations. Thus, the claims are now procedurally defaulted, not merely unexhausted. Campbell has failed to show cause and prejudice to excuse the defaults. Nor has he made any attempt to show that he was actually (factually) innocent.

Alternatively, to the extent these passages from the Nebraska Court of Appeals' opinion may be considered adjudications of the merits of the arguments set

forth in Claim One, Subparts (3), (5), and (11), they are entitled to deference under the statutory standard of review that applies to factual and legal conclusions reached by the state courts. Moreover, this court agrees with the Nebraska Court of Appeals' determination that Campbell failed to allege sufficient facts in support of his arguments that trial counsel was ineffective. As in the state court proceedings, Campbell offers no specific facts or arguments in his Petition in support of his conclusory allegations that counsel was ineffective. Such conclusory allegations are not sufficient to prevail on a claim of ineffective assistance of counsel.

### C. Claim One, Subpart (12)

In Claim One, Subpart (12), Campbell argues that he received ineffective assistance of counsel because counsel failed to have the gunshot residue testing that was done processed. (Filing 1 at CM/ECF p. 7.) On appeal from the denial of the postconviction motion, the Nebraska Court of Appeals addressed and rejected this claim as follows:

> Campbell asserts trial counsel was deficient for failing to request processing of the gunshot residue (GSR) testing that was done on Campbell the night of the incident. It is Campbell's contention that the results of the GSR testing would "prove the innocence of [Campbell]" and "show that there was reasonable doubt as to having fired a weapon on that evening." Brief for appellant at 36. However, we find that any deficiency in failing to process the GSR testing does not create a reasonable probability that the result of Campbell's trial would have been different. By its very nature, gunshot residue is susceptible to being shaken or washed off with ease. Therefore, its absence alone does little to establish an individual did not recently fire a weapon.

> At trial, State Trooper Anthony Sattlefield testified that testing of GSR kits is available upon request by the prosecution or defense based on factors that determine "whether or not it adds value to the investigation[.]" In this case, one factor in determining the value of GSR testing was the fact Campbell had been walking around snowy areas for up to an hour. Based on the other evidence introduced at trial, and the minimal value GSR testing would have added to this case, we

find that trial counsel's failure to seek processing of the GSR testing was not sufficient to undermine confidence in the outcome of Campbell's trial. Therefore, Campbell has not established prejudice and an evidentiary hearing was not required.

(Filing 7-4 at CM/ECF p. 9.)

Applying the prejudice prong of the *Strickland* test, the Nebraska Court of Appeals carefully examined Campbell's claim and found it wanting.  Applying the "doubly deferential" standard of review for such cases, Campbell's ineffective assistance of trial counsel claim set forth in Claim One, Subpart (12), has no merit.

## D.  Claim Two

In Claim Two, Campbell contends that he was denied his right to a fair trial because of jury misconduct where two of the State's witnesses discussed the case in detail outside of the courtroom while a jury member listened in and admitted to asking a question. (Filing 1 at CM/ECF p. 9.)

Campbell raised Claim Two in his postconviction motion, but the state district court found that the claim was procedurally barred because Campbell could have raised the issue on direct appeal. (Filing 7-11 at CM/ECF p. 26.) Campbell did not raise a direct challenge to the alleged juror misconduct on postconviction appeal or in his petition for further review. Rather, on postconviction appeal to the Nebraska Court of Appeals, Campbell argued that the state district court incorrectly construed his claim as a direct challenge to alleged juror misconduct rather than a claim of ineffective assistance of counsel for failure to preserve the issue and raise the misconduct on direct appeal. (Filing 7-7 at CM/ECF pp. 5, 37-41; *see also* Filing 7-4 at CM/ECF p. 9.) And, in his petition for further review with the Nebraska Supreme Court, Campbell assigned that the Nebraska Court of Appeals erred in affirming the state district court's denial of an evidentiary hearing on his motion for postconviction relief because of ineffective assistance of appellate counsel for failing to properly preserve juror misconduct issues. (Filing 7-9 at CM/ECF p. 1.)

Claim Two has been procedurally defaulted either because it should have been presented on direct appeal and it was not or because when presented in the postconviction litigation Campbell failed to present the issue to the Nebraska appellate courts and thus the claim was not presented in one complete round of review. Because Campbell has no other avenue open to him in the state court, the claim has been procedurally defaulted on state law grounds.

Alternatively, the court finds that the claim is without merit. In its opinion on postconviction appeal, the Nebraska Court of Appeals addressed the juror misconduct issue in the context of Campbell's claim of ineffective assistance of counsel. The court initially noted that "[w]hether a criminal defendant is claiming juror misconduct, or ineffective assistance of counsel, he or she must establish prejudice under either theory." (Filing 7-4 at CM/ECF p. 9.) The court then wrote:

> A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial. *State v. McSwine*, 24 Neb. App. 453, 890 N.W.2d 518 (2017). In this case, Campbell alleges that he was denied a fair trial when two of the State's witnesses were observed by defense counsel discussing the case in the hallway during a recess near one of the jury members. After the incident at issue took place, Campbell's attorney immediately notified the trial judge of what he had observed. Campbell's attorney was outside the courtroom when he noticed two of the State's witnesses, who had not yet testified, talking about Campbell's arrest. One of the witnesses, State Trooper Trinity Jones, indicated that he was prepared to fire his weapon under the circumstances. One of the jurors was standing nearby as the conversation took place.

> Campbell's attorney indicated that he immediately intervened and informed Jones that he was not permitted to discuss the case. Campbell's attorney informed the court that the conversation took place "in direct earshot of [the juror]" and that the witnesses were within five feet of the juror. The trial judge then proceeded to call in the juror and

asked whether she had heard anyone discussing the case during the recess. The juror indicated that she had not. Because we find that the record indicates the juror was not influenced by any outside discussion of the case by the State's witnesses, Campbell has not shown he was prejudiced by trial counsel's failure to preserve and raise the issue on appeal. . . .

(Filing 7-4 at CM/ECF pp. 9-10.)

The Nebraska Court of Appeals' factual findings, which Campbell has not rebutted, are entitled to deference under 28 U.S.C. § 2254. In a habeas context, a federal court may only grant relief on a juror misconduct claim where the alleged misconduct "had substantial and injurious effect or influence in determining the jury's verdict." *Vigil v. Zavaras*, 298 F.3d 935, 941 (10th Cir. 2002); *Adams v. Griffith*, No. 4:17-CV-01580-AGF, 2020 WL 5800994, at *5 (E.D. Mo. Sept. 29, 2020) (same) (quoting *Vigil*, 298 F.3d at 940); *see also Helmig v. Kemna*, 461 F.3d 960, 963 (8th Cir. 2006) (applying *Vigil*, holding that "to warrant relief [on a juror misconduct claim], [a] habeas petitioner . . . must prove that the [extraneous information] was both extraneous and prejudicial," and refusing to apply to a state habeas case a presumption of jury prejudice). Campbell has failed to meet this burden. The juror did not hear anyone discussing the case outside of the courtroom; therefore, the juror could not have been influenced by any outside discussion of the case by the State's witnesses. There is no basis for Campbell's jury misconduct claim.

**E.  Claim Three**

In Claim Three, Campbell argues that he was denied his right to a fair trial because the jury instruction on the charge of discharging a firearm while in or in proximity of any motor vehicle at any person or occupied motor vehicle improperly excluded the term "recklessly." (Filing 1 at CM/ECF pp. 10-11.)

Like Claim Two, Campbell raised Claim Three in his postconviction motion, but the state district court found that the claim was procedurally barred because Campbell could have raised the issue on direct appeal. (Filing 7-11 at CM/ECF p. 26.) On postconviction appeal, the Nebraska Court of Appeals determined that "if Campbell's postconviction claim is construed as a direct challenge to the jury instructions given at trial, it is procedurally barred and the district court did not err in denying the claim without an evidentiary hearing." (Filing 7-4 at CM/ECF p. 11.) The court also ruled that if "Campbell's claim was appropriately raised as an ineffective assistance of counsel claim, the district court did not err in denying the claim without an evidentiary hearing" because the record and files affirmatively show that Campbell is not entitled to relief. (Filing 7-4 at CM/ECF p. 11 (citing *State v. Barber*, 918 N.W.2d 359, 366 (Neb. Ct. App. 2018).) Campbell did not raise any jury instruction issue—either as a direct challenge to the jury instructions or as an ineffective assistance of counsel claim—in his petition for further review to the Nebraska Supreme Court. (*See* Filing 7-9 at CM/ECF pp. 5-8.)

The court agrees with Respondent that Claim Three has been procedurally defaulted either because it should have been presented on direct appeal and it was not or because when presented in the postconviction litigation Campbell failed to present the issue to the Nebraska Supreme Court in his petition for further review and thus the claim was not presented in one complete round of review. Because Campbell has no other avenue open to him in the state court, the claim has been procedurally defaulted on state law grounds. Moreover, there is no basis to excuse the default whether judged under the "cause" and "prejudice" standard or the "miscarriage of justice" standard.

## V. CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district

court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). The court has applied the appropriate standard and determined that Campbell is not entitled to a certificate of appealability.

IT IS THERFORE ORDERED that the Petition for Writ of Habeas Corpus (filing 1) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. Judgment will be issued by separate document.

Dated this 8th day of March, 2021.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge